United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 13, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-50075

CAROLYN MODICA,

Plaintiff-Appellee,

versus

CLARE TAYLOR, ET AL.,

Defendants,

ANTOINETTE HUMPHREY,

Defendant - Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This is an appeal from the district court's denial of summary judgment premised on the defendant's assertion of qualified immunity. The plaintiff filed suit alleging, inter alia, wrongful termination for exercising her First Amendment rights and taking leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601-2654 (2000). In response, the defendant filed a motion for summary judgment asserting qualified immunity. The district court concluded that the defendant was not entitled to qualified immunity and that there were genuine issues of material fact precluding summary judgment on both claims. We affirm in part and reverse in part.

I. FACTUAL AND PROCEDURAL BACKGROUND

Carolyn Modica began working as an inspector for the Texas Cosmetology Commission ("TCC") in Beaumont, Texas, in August 1990. In 2000, Modica and other TCC employees expressed concerns about the demotion of their supervisor, Larry Perkins, in a letter sent to the chairman of the TCC. Modica also attended a TCC meeting during which she addressed the TCC regarding Perkins's demotion, her discovery of files containing pornography on an employee's government-issued computer, and her concerns that the Executive Director, Neil Holifield, had instructed inspectors to report their numbers incorrectly.

According to Modica, following the TCC meeting, her supervisors retaliated against her in various ways for voicing her concerns and associating with other employees. Specifically, Modica asserts that she was denied a merit pay raise and that her application for the position of Director of Enforcement was ignored. In November 2000, Modica filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination.

In December 2000, during an inspection of a beauty school in her district, Modica was involved in an altercation with the school's vice-president and her brother. The police were called to the scene and Modica accused the two of assaulting her. Crediting Modica's account, the police arrested the vice president and her brother; however, two months later, the vice president filed a criminal complaint against Modica. Following a jury trial, Modica was convicted of simple assault.

In September 2001, Modica was again denied a merit pay raise. In May 2002, Modica sent a letter to Texas State Representative Roberto Gutierrez accusing the TCC and Holifield of the following: (1) "cheating on numbers to make performance levels higher"; (2) eliminating the tracking system for complaints; (3) abusing travel expenses; (4) misusing state funds; (5) permitting

2

inappropriate activities in the workplace; (6) failing to make the "law books" sold to the public consistent; (7) harassing and abusive conduct and preferentially treating schools found in violation of state regulations; and (8) failing to hold administrative hearings to collect outstanding fines.

In June 2002, Modica applied for the position of Executive Director, which became vacant after Holifield's death. Her application was considered, but she did not receive an interview and was not selected for the position. Antoinette Humphrey was selected as the new Executive Director, and, in that capacity, Humphrey was charged with responding to Modica's complaints. Accordingly, she met in person with Representative Gutierrez to address the contents of Modica's May 2002 letter; Modica participated in the meeting via telephone. Modica contends that shortly after the meeting, Humphrey began retaliating against her by micromanaging her schedule and requiring her to travel long distances to perform inspections. On November 12, 2002, Modica filed the underlying suit against Humphrey and others alleging First Amendment retaliation pursuant to 42 U.S.C. § 1983.

In April 2003, Modica injured her knee while working; as a result, she filed a claim for workers' compensation benefits and took medical leave in June 2003. Before Modica took leave, Humphrey informed her that her inspection district would be eliminated due to budgetary constraints. Humphrey subsequently offered her an inspector position in San Antonio; Modica accepted and was expected to report to work on August 1, 2003.

On July 6, 2003, Modica communicated with the TCC's Human Resources manager via e-mail to ask whether the agency was covered by the FMLA and to request the appropriate documents. Two days later, Modica sent a second e-mail to the Human Resources manager requesting the relevant forms for short- and long-term disability. The following day she renewed her request for the documents. Modica asserts that she never received the information or forms that she requested.

3

On August 1, 2003, Modica notified the TCC that she was still on medical leave. Humphrey responded that the San Antonio position needed to be filled immediately; however, she offered Modica a position in El Paso, which was to be held open through the end of August, the expiration of Modica's medical leave. Modica accepted but warned that she was not sure when she would be able to return to work. Modica subsequently extended her medical leave until November 12, 2003; consequently, she did not report to work on September 2 as expected. On September 15, 2003, the TCC terminated Modica's employment; Humphrey informed her that the El Paso position needed to be filled immediately and no other inspection positions were available.

Modica subsequently amended her pleadings to allege wrongful termination in retaliation for filing an EEOC charge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3; exercising her First Amendment rights; and taking FMLA leave. The defendants filed various motions for summary judgment and partial summary judgment. The district court dismissed the TCC and individual commissioners for various reasons; the court also dismissed Modica's Title VII claim as untimely. Nevertheless, the court concluded that there were genuine issues of material fact regarding whether Humphrey actually terminated Modica for requesting FMLA leave or writing the letter to Representative Gutierrez. The court further concluded that Humphrey was not entitled to qualified immunity against either of these claims. Humphrey timely appealed, challenging the district court's denial of summary judgment based on her assertion of qualified immunity.

## II. DISCUSSION

A. Jurisdiction and Standard of Review

Because this an appeal from the district court's denial of summary judgment predicated on qualified immunity, we have jurisdiction "only to the extent that the appeal concerns the purely legal

4

question whether the defendant[ ] [is] entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc). Accordingly, we do not review the district court's determination that a genuine factual dispute exists; instead, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* at 348.

B. Qualified Immunity

Humphrey challenges the district court's denial of qualified immunity against both of Modica's claims of retaliatory discharge. The doctrine of qualified immunity immunizes government officials acting within their discretionary authority from civil damages if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004). The qualified immunity determination is a two-step inquiry. First, the court must decide whether a plaintiff's allegations, if true, establish a violation of a clearly established right. *Id.* Second, if the plaintiff has alleged a violation, the court must then decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident. *Id.* Even if the government official's conduct violates a clearly established federal right, the official is nonetheless entitled to qualified immunity if her conduct was objectively reasonable. *Id.* Accordingly, to decide whether the district court erred in denying Humphrey's motion for summary judgment, we must first determine whether Modica's allegations, if true, manifest conduct that is objectively unreasonable in violation of a clearly established federal right. *See Kinney*, 367 F.3d at 346.

5

"'When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.'" *Atteberry v. Nocona Gen. Hosp.* 430 F.3d 245, 253 (5th Cir. 2005) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).

> To discharge this burden, a plaintiff must satisfy a two-prong test. First, he must claim that the defendants committed a constitutional violation under current law. Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. See id. This bifurcated legal standard is designed both to promote clearer standards for official conduct and to spare defendants unwarranted liability and court costs.

*Id.* (citations omitted).

C. Section 1983 First Amendment Retaliation

To prevail on a § 1983 First Amendment retaliation claim, a public employee must establish the following: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action. *Johnson v. Louisiana* 369 F.3d 826, 830 (5th Cir. 2004). "Whether the speech at issue is on a matter of public concern is a question of law that must be determined by the court." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005).

Humphrey argues that the district court erred in concluding that Modica's speech was protected by the First Amendment because it did not involve matters of public concern; instead, she contends that Modica's speech solely concerned private matters because it was in furtherance of a personal employer-employee dispute. Modica's letter to Representative Gutierrez discussed private workplace issues, such as inappropriate activities in the work place and preferential treatment of certain schools, as well as matters of public concern, namely the misuse of public funds. Accordingly,

6

Modica's speech is properly classified as mixed speech. We have observed that "[m]ixed speech cases are perhaps the most difficult subset of employee speech cases to adjudicate." *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 367 (5th Cir. 2000). In deciding whether Modica's speech as a whole relates to the public concern such that it is entitled to protection, we consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 382 (5th Cir. 1999).

Although Modica's letter addressed some private issues, the content of Modica's letter is primarily public. Modica expressed private concerns relating to management policies such as allowing employees to participate in inappropriate activities during work hours and Holifield's abuse of his authority;[1] however, "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern," *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir. 1991). Modica raised concerns about the misuse of public funds in regard to employee travel and unnecessary purchases for the office, as well as concerns about the erroneous reporting of the number of inspections to the state legislature.[2] *See Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (stating that speech disclosing evidence

---

[1]Modica's letter states that Holifield "allowed hair braiding to happen on state time" and permitted a baby shower to be "held on state time at the agency." She also asserts that "[h]e writes employees up without investigation to [sic] the incident."

[2]Modica's letter stated that "Mr. Holifield has made changes in the way numbers of inspections are reported to the legislators so that the performance levels have risen from 38 percent to 100 percent within the last three years." With regard to the misuse of state funds, Modica stated that Holifield purchased "fine china, stainless and crystal" for the break room and that "[i]nspectors had been issued laptop computers and they had barely been implemented in the field when he decided that the office staff needed new computers, so he issued the used office PC's to the inspectors, thus giving inspectors two computers each."

of impropriety by city officials addresses matters of public concern); *see also Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law, and seeing that public funds are not purloined." (citations omitted)). As we explained in *Kennedy*, "the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government." 224 F.3d at 372. Despite Modica's statement in the letter that she was a victim of retaliation and harassment, only two of the ten issues she addressed relate to this allegation; the letter's primary focus is Holifield's malfeasance. Accordingly, "the releas[e] of the [letter] to the public would inform the populace of more than the fact of [Modica]'s employment grievance," *see id.* at 372, and, the content of Modica's speech weighs in favor of protection.

The form of Modica's speech, a letter to a state representative, also militates in favor of protection. Though not dispositive, Modica's choice to inform someone outside the TCC of her concerns supports her contention that the speech is public. *Cf. Dodds*, 933 F.2d at 274 (finding that the form and context of an employee's complaint did not support her contention that she addressed a matter of public concern where she did not address her complaints to anyone outside the institution); *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362-63 (5th Cir. 1986) ("Terrell's personal notebook cannot serve as the basis for a claim that he was fired for exercising his first amendment rights. He made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have had any occasion to do so."). In *Teague*, former police officers alleged that they were discharged for exercising their First Amendment rights by filing grievances against the Chief of Police. 179 F.3d 377. We reasoned that the form of the plaintiffs'

8

speech was private because the grievances focused on their inability to obtain redress for removal from an investigation. *Id.* at 383. In contrast, the majority of Modica's concerns did not relate to her personal grievances, but to the impact Holifield's management had on the public and licensees.[3] Consequently, we conclude that the form of Modica's speech was primarily public.

The context of Modica's speech also favors protection. Although there is evidence of an employer-employee dispute in the underlying circumstances, namely the reassignment of Larry Perkins and Modica's allegations of retaliation, the majority of Modica's concerns did not relate to this dispute nor her job, but to the operation of the TCC as a whole. *Cf. Kennedy*, 224 F.3d at 374. ("Therefore, unlike *Terrell*, where Terrell's speech regarding an intra-departmental investigation related only to his own job, Kennedy's speech here referred to producing a safety plan demanded by the Parish at large to safeguard patrons and employees alike, and indeed, her own suggestion appeared within the plan itself."). For example, Modica expressed concerns regarding the elimination of the complaint tracking system, the delay in holding administrative hearings, and the failure of the agency to distribute the regulation books for which it received payment. Indeed, Modica's letter only addressed Perkins in the context of Mr. Holifield's elimination of the complaint tracking system, stating that the high reporting of complaints had made her "previous boss, Larry Perkins and us look bad." This reference is more of an explanation as to why the elimination of the complaint tracking system is questionable than an effort to address her disagreement with the reassignment of Larry Perkins.

---

[3]Modica's letter stated: "The licensees are required to purchase the current law book. . . . The public complains that they sent their money orders to TCC, but never received their books. TCC cannot account for the books and money received." She also stated that the "agency is behind two (2) years in administering [administrative] hearings. We are losing revenue."

Nor did Modica's letter focus on her failure to receive promotions or raises. Once again *Teague* offers a useful comparison. Unlike the letter at issue in *Teague*, Modica's letter urged that action be taken against Holifield because "the public and TCC deserve to have better representation," not that she receive a particular redress, whereas "[t]he grievance submitted by Teague and Burkett to Ragland . . . express[ed] 'the need to be given a fair hearing concerning our handling of [the Jones] investigation,'" *Teague*, 179 F.3d at 383 (third alteration in original). Further, in *Teague*, we noted the plantifffs' "attempt to take their grievance to the town manager"; however, we concluded that "[t]his was not [ ] an attempt to make the matter public, but rather simply an effort to go over [their supervisor's] head by appealing to someone with supervisory authority over him." 179 F.3d at 383 n.7. In contrast, Modica's letter constitutes an effort to bring public attention to problems in the TCC's administration of its public duties. Although, some statements are attributable to her personal grievances,[4] this represented only a small aspect of the letter and the underlying circumstances. Further, her complaints regarding Holifield, commencing in July 2000, were related to allegations of misuse of state funds, not personal grievances.[5] Indeed, it is not until after she made these complaints to the TCC that she alleges she was retaliated against by way of not receiving promotions. Accordingly, we conclude that the context of the letter is more public than private in nature.

---

[4] For example, Modica states in her letter that she "was passed up for a raise" as "another incident of his way of retaliation."

[5] In an e-mail sent to the TCC Modica stated "I would like to formally file a complaint." She then states that Holifield inappropriately spending state funds, citing the same and similar activities she referenced in her letter to Representative Gutierrez, e.g., needlessly mailing packages; purchasing "glass china, silverware, pots and pans, and a dishwasher"; purchasing new computers. She also referenced the failure of licensees to receive the books they requested.

10

Despite the presence of some private interests, the content, form, and context of Modica's letter demonstrate that her speech was predominately public. In *Moore v. City of Kilgore, Texas*, 877 F.2d 364, (5th Cir. 1989), we observed that the plaintiff's speech "involve[d] a hint of personal 'employee' considerations" but nevertheless concluded that his "speech as a whole, [] considering the content, context, and form together, . . . involve[d] a matter of public concern." *Id.* at 371-72 (footnote omitted). Likewise, taken as a whole, Modica's speech is entitled to First Amendment protection.

The district court concluded that Modica's interest in commenting on these matters outweighed Humphrey's interest in promoting efficiency and Humphrey does not challenge this conclusion on appeal. The court further determined that Modica raised a genuine issue of material fact as to whether her speech was a substantial or motivating factor in her termination. As explained above, because this is an appeal of a denial of summary judgment predicated on qualified immunity, we do not review the district court's conclusion that a genuine issue of material fact exists. Consequently, we conclude that, if true, Modica's allegations are sufficient to establish a violation of her First Amendment rights.

Humphrey does not dispute that the First Amendment's bar against retaliation for protected speech was clearly established federal law. *See, e.g.*, *Kinney*, 367 F.3d at 369. Nor does she argue that her conduct was objectively reasonable. Accordingly, we conclude that Modica has alleged a violation of a clearly established right and we affirm the district court's denial of summary judgment on Modica's First Amendment retaliation claim based on Humphrey's assertion of qualified immunity.

D. FMLA Retaliation Claim

11

Humphrey argues that the district court erred in denying her motion for summary judgment with regard to Modica's FMLA claim on several grounds. First, she contends that a public official is not an employer for purposes of the FMLA. Next, she argues that she is entitled to qualified immunity because the FMLA was not clearly established law at the time and because her decision to terminate Modica's employment was not objectively unreasonable.

1. *Whether Humphrey is an "employer" for purposes of the FMLA*

Relying on *Kazmier v. Widmann*, 225 F.3d 519 (5th Cir. 2000), *abrogated by Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721(2003), Humphrey contends that this circuit does not permit suits against public officials under the FMLA. Specifically, Humphrey relies on footnote 65 of the *Kazmier* decision stating that "[t]he claims brought against the defendants in their individual capacities must be dismissed for lack of subject matter jurisdiction because it is clear that the State of Louisiana is the real party in interest." *Kazmier*, 225 F.3d at 533 n.65. Humphrey's reliance on *Kazmier* is misplaced.

As a general rule the Eleventh Amendment does not bar suits against officers in their individual capacities. *Hudson v. City of New Orleans*, 174 F.3d 677, 687 n.7 (5th Cir. 1999); *Martin v. Thomas*, 973 F.2d 449, 458 (5th Cir. 1992). Nevertheless, where the state is the real and substantial party in interest, the Eleventh Amendment may bar the suit. *See Ysleta Del Sur Pueblo v. Laney*, 199 F.3d 281, 286 (5th Cir. 2000); *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 345 (5th Cir. 1998).

Humphrey contends that in *Kazmier* we stated our "unwillingness to hold public officials liable under the FMLA." This proves too much. "The application of the [Eleventh] [A]mendment to suits against state officials in their individual capacity depends on the circumstances." *Luder v. Endicott*,

12

253 F.3d 1020, 1022 (7th Cir. 2001). Consequently, the *Kazmier* panel's conclusion that the state was the real party in interest must be limited to the facts of that case. *Cf. Luder*, 253 F.3d at 1024-25 (explaining that the state would be required to pay damages to the 145 plaintiffs and concluding that casting the suit, brought under the Fair Labor Standards Act, as one against the officers in their individual capacities was a "trasparent[] effort at an end run around the Eleventh Amendment"). Moreover, we have previously recognized the general rule that the Eleventh Amendment does not bar suits against state officials in their individual capacities. *Hudson*, 174 F.3d at 687 n.7; *Martin*, 973 F.2d at 458. "When panel opinions appear to conflict, we are bound to follow the earlier opinion." *H&D Tire & Automotive-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 330 (5th Cir. 2000). Accordingly, even if *Kazmier* could bear the weight Humphrey intends for it to carry, we would not be bound. Humphrey's reliance on *Kazmier* is misguided and the Eleventh Amendment does not bar the instant suit. Nevertheless, it does not necessarily follow that public employees may be sued in their individual capacities under the FMLA; thus, we turn to Humphrey's contention that she is not an employer for purposes of the FMLA.

Humphrey argues that employees of public agencies may not be held personally liable under the FMLA as employers. We have not had occasion to consider this question; however, several our sister circuits, as well as various district courts, have done so. The Sixth and Eleventh Circuits have held that a public official is not an employer for purposes of the FMLA when sued in her individual capacity, but the Eighth Circuit reached the opposite conclusion. *Compare Mitchell v. Chapman*, 343 F.3d 811, 832 (6th Cir. 2003), *and Wascura v. Carver*, 169 F.3d 683, 687 (11th Cir. 1999), *with Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002). The district courts are similarly divided on this question; however, it appears that a majority have concluded that public employees may be liable in

13

their individual capacities under the FMLA. *See Cantley v. Simmons*, 179 F. Supp. 2d 654, 656 (S.D.W. Va. 2002) ("While some district courts have decided otherwise, the majority of district courts have concluded that public employee supervisors can be sued individually under the FMLA."). *Compare Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 728-29 (M.D.N.C. 2004) (holding that public employees can be liable under the FMLA), *and Morrow v. Putnam*, 142 F. Supp. 2d 1271, 1273 (D. Nev. 2001) (same), *with Keene v. Rinaldi*, 127 F. Supp. 2d 770, 776 (M.D.N.C. 2000) (holding that public officials are not liable in their individual capacities under the FMLA).

We begin our analysis with the text of the statute. *Doe v. KPMG, LLP*, 398 F.3d 686, 688 (5th Cir. 2005). The FMLA provides, in relevant part:

> The term "employer"--
> (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
> (ii) includes--
> (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and
> (II) any successor in interest of an employer;
> (iii) includes any "public agency", as defined in section 203(x) of this title; and
> (iv) includes the Government Accountability Office and the Library of Congress.

29 U.S.C. § 2611 (4)(A). The statute plainly includes in the definition of employer "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). The statute further includes public agencies as employers. *Id.* § 2611 (4)(A)(iii). Therefore, if a public employee "acts, directly or indirectly, in the interest of an employer," he satisfies the definition of employer under the FMLA, and therefore, may be subject to liability in his individual capacity. *Accord Darby*, 287 F.3d at 681.

14

The Sixth Circuit rejected this interpretation in *Mitchell*, holding that "the FMLA's individual liability provision does not extend to public agencies." 343 F.3d at 832. The court offered three reasons for its conclusion:

> First, Section 2611(4)(A) segregates the provision imposing individual liability from the public agency provision. Second, an interpretation that commingles the individual liability provision with the public agency provision renders certain provisions of the statute superfluous and results in several oddities. Finally, as evidenced by other provisions of the statute, the FMLA distinguishes its definition of employer from that provided in the [Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 203] by separating the individual liability and public agency provisions.

*Id.* at 832. We address each argument in turn.

The Sixth Circuit concluded that " the section defining 'employer,' 29 U.S.C. § 2611(4)(A), explicitly separates the individual liability provision and public agency provision into two distinct clauses." *Mitchell*, 343 F.3d at 829. The court reasoned

> Notwithstanding this repeated and consistent use of the em dash, Section 2611(4)(A) lacks any punctuation demonstrating an inter-relationship between clauses (ii)-(iv). Indeed, the separation of otherwise related concepts (i.e., what the term "employer" "includes") into distinctly enumerated clauses compels an interpretation that treats each clause in an independent manner. This is particularly the case in light of clause (ii)'s inclusion of an em dash preceding the individual liability provision and successor in interest provision.

*Id.* at 830. We respectfully disagree. Congress's use of the word "and" following clause (iii) suggests that there is some relationship between clauses (i)-(iv). *Accord Hewett v. Willingboro Bd. of Educ.*, 421 F. Supp. 2d 814, 819 (D.N.J. 2006) ("In any event, in light of Section 2611(4)(A)'s use of the inclusive term 'and' linking clauses (i)-(iv), the Court does not agree with *Mitchell*, 343 F.3d at 829-30, that Congress intended those provisions to be mutually exclusive."). Additionally, following the *Mitchell* court's own reasoning that the em dash denotes an inter-relationship, Congress's use of the em dash following the term "employer" indicates a relationship between clauses such that

15

"employer '"means" what is provided for in subparagraph (i) and "includes" what is provided for in subparagraphs (ii), (iii), and (iv).'" *Sheaffer*, 337 F. Supp. 2d at 728 (quoting *Morrow*, 142 F. Supp. 2d at 1273).

The *Mitchell* court also concluded "the commingling of clauses (i)-(iv) into the term 'employer' yields an interpretation that renders other provisions of the statute superfluous, as well as creates several oddities." *Mitchell*, 343 F.3d at 830. Specifically, the *Mitchell* court reasoned that "the commingling of clause (i) and (ii) with the public agency provision renders superfluous Section 2611(4)(B)." *See id.* at 831. Title 29 U.S.C.§ 2611(4)(B) provides that "[f]or purposes of subparagraph (A)(iii), a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce." The court further noted that "a public agency does not have to meet the 50 employee requirement to be considered an employer under the statute." *Mitchell*, 343 F.3d at 831 (citing 29 C.F.R. § 825.104(a)). We do not find these arguments persuasive.

As the *Morrow* court recognized,

[w]hile this statute becomes recursive when applied to supervisory personnel, because the definition of employer refers back to the word employer itself, there is no reason to assume that the term "employer" in subparagraph 4(A)(ii) means anything other than what Congress defined it to mean in the various definitions of paragraph 4(A).

142 F. Supp. 2d at 1272-73. Contrary to the *Mitchell* court's reasoning, section 2611(4)(B) is not superfluous under this reading, it relieves plaintiffs of the burden of proving that a public agency is engaged in commerce. *See Hewett*, 421 F. Supp. 2d at 820. The most straight forward reading of the text compels the conclusion that a public employee may be held individually liable under the FMLA.

Finally, the Sixth Circuit reasoned that "[a] definition of employer that incorporates the individual liability provision and public agency provision into a single clause is substantially similar to, if not identical, to the FLSA's definition of employer " and that Congress would have expressly

16

adopted the FLSA's definition of employer if it intended the definitions to be identical. *Mitchell*, 343 F.3d at 831. We disagree.

The definition of "employer" under the FMLA is very similar to the definition of "employer" under the FLSA. The FLSA includes within the definition of "employer" "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d). Accordingly, several courts have concluded that the term "employer" should be interpreted the same under both statutes. *See, e.g.*, *Wascura*, 169 F.3d at 685-86 ("[T]he FMLA's definition of 'employer' is more similar to, actually it is materially identical with, the definition of 'employer' used in the Fair Labor Standards Act ('FLSA'), 29 U.S.C. § 203(d)."); *Cantley*, 179 F. Supp. 2d at 657-58 ("Another factor courts have considered when determining whether individual liability exists is the similarity between the statutory definitions of "employer" under the FMLA and the FLSA.").

Additionally, the Code of Federal Regulations provides: "Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer, any successor in interest of a covered employer, and any public agency." 29 C.F.R. § 825.104(a). This is virtually the same as the definition provided in the FLSA except that the FMLA definition includes successors in interest and does not reference labor organizations. *See Hewett*, 421 F. Supp. 2d at 821 (rejecting the *Mitchell* court's argument regarding Congress's failure to reference the FLSA in the FMLA's definition of employer and noting "it would have been curious for the FMLA to have incorporated the FLSA's definition of 'employer,' as that definition makes explicit reference to 'labor organizations'"). Further the Code of Federal Regulations also explains:

17

> An "employer" includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees. The definition of "employer" in section 3(d) of the Fair Labor Standards Act (FLSA), 29 U.S.C. 203(d), similarly includes any person acting directly or indirectly in the interest of an employer in relation to an employee. As under the FLSA, individuals such as corporate officers "acting in the interest of an employer" are individually liable for any violations of the requirements of FMLA.

29 C.F.R. § 825.104(d). Accordingly, we agree with the *Wascura* court that "[t]he fact that Congress, in drafting the FMLA, chose to make the definition of 'employer' materially identical to that in the FLSA means that decisions interpreting the FLSA offer the best guidance for construing the term 'employer' as it is used in the FMLA." *Wascura*, 169 F.3d at 686. We have previously held that a sheriff is an employer for purposes of the FLSA. *Lee v. Coahoma County, Miss.*, 937 F.2d 220, 226 (5th Cir. 1991), *amended by* 37 F.3d 1068 (5th Cir. 1993). Therefore our conclusion that plain language of the FMLA permits public employees to be held individually liable is consistent with our holding in *Lee*. *Cf. Wascura*, 169 F.3d at 686 ("Thus, *Welch* [*v. Laney*, 57 F.3d 1004 (11th Cir. 1995),] establishes as the law of this circuit that a public official sued in his individual capacity is not an 'employer' subject to individual liability under the FLSA. Because 'employer' is defined the same way in the FMLA and FLSA, *Welch* controls this case."). Consequently, the district court did not err in holding that Humphrey may be liable as an employer under the FMLA. We turn now to Humphrey's contention that the district court erred in concluding she was not entitled to qualified immunity.

*2. Whether Humphrey is entitled to qualified immunity*

Humphrey argues that she is entitled to qualified immunity because the FMLA was not clearly established at the time Modica's employment was terminated. Specifically, she argues that it was not

18

clear whether the TCC was subject to the FMLA because it employs fewer than fifty employees. We are not persuaded.

As noted above, 29 C.F.R. § 825.108(d) provides:

All public agencies are covered by FMLA regardless of the number of employees; they are not subject to the coverage threshold of 50 employees carried on the payroll each day for 20 or more weeks in a year. However, employees of public agencies must meet all of the requirements of eligibility, including the requirement that the employer (e.g., State) employ 50 employees at the worksite or within 75 miles.

Humphrey's lack of knowledge that public agencies are subject to the FMLA regardless of the number of employees does not mean the law was not clearly established. *See Mitchell*, 343 F.3d at 831 ("[I]t is well-settled that a public agency does not have to meet the 50 employee requirement to be considered an employer under the statute."). Thus, we agree with the district court that it was clearly established that public agencies were subject to the FMLA regardless of the number of employees when Humphrey terminated Modica's employment. Nevertheless, this does not end our inquiry.

Humphrey asserts that the rights and protections defined by the FMLA were not clearly established in 2003, therefore she should not be subject to personal liability for her decision to discharge Modica. But Humphrey does not argue that she is entitled to qualified immunity because the law was not clearly established that she, as an employee of a public agency, is potentially liable as an "employer" to Modica for retaliation against her for exercising rights under the FMLA. Despite her failure to make this specific argument, we conclude that her qualified immunity assertion is not waived for two reasons. First, although Humphrey failed to develop an explicit legal argument on this ground, she raised the qualified immunity defense in response to Modica's FMLA claim; therefore, it was Modica's burden to prove that the law was clearly established. *Atteberry*, 430 F.3d at 253; *cf*.

19

*Marshall v. Allen*, 984 F.2d 787, 797-798 (7th Cir. 1993) (stating that where "the defendants raised a qualified immunity defense with regard to the entirety of the [plaintiff]'s First Amendment claim," "[t]he failure of the defendants to make a supporting argument regarding the state of the law on freedom of association should not result in waiver of the defendants' claim to qualified immunity on that issue"). Second, in her motion for summary judgment, relying on *Kazmier*, 225 F.3d at 533, and *Wascura*, 169 F.3d 683, Humphrey asserted that Modica had not shown that the law was not clearly established that public officials could be liable in their individual capacities under the FMLA. Accordingly we consider whether Modica has shown that Humphrey's actions were objectively unreasonable in light clearly established law; we conclude that she has not.

As evidenced by the discussion above, individual public employee liability is a subject of much debate among the courts of appeals. *See, e.g.*, *Mitchell*, 343 F.3d at 832; *Wascura*, 169 F.3d at 687; *Darby*, 287 F.3d at 681. Although today we join those courts that hold that public employees are subject to individual liability under the FMLA, in the absence of a prior ruling by the Supreme Court, this court, or a consensus among our sister circuits, we cannot say that the law was clearly established in 2003 when these events giving rise to Modica's allegations occurred. *Cf. McClendon*, 305 F.3d at 331-32 ("[W]hile a number of our sister circuits had accepted some version of the state-created danger theory as of July of 1993, given the inconsistencies and uncertainties within this alleged consensus of authorities, an officer acting within the jurisdiction of this court could not possibly have assessed whether his or her conduct violated this right in the absence of explicit guidance from this court or the Supreme Court."). Therefore, Humphrey is entitled to qualified immunity against Modica's FMLA claim because it was not clearly established that public employees are subject to

20

individual liability under the FMLA when Humphrey terminated Modica's employment, and the district court erred in failing to grant Humphrey's motion for summary judgment on this ground.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Humphrey's motion for summary judgment premised on qualified immunity on Modica's First Amendment claim and REVERSE the district court's denial of Humphrey's motion for summary judgment on Modica's FMLA retaliation claim.